THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. AARON K. NEELD, DIRECTOR, DIVISION OF TAXATION, *ET AL.*, DEFENDANTS-RESPONDENTS.

THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, A CORPORATION, PLAINTIFF-APPELLANT, v. AARON K. NEELD, DIRECTOR, DIVISION OF TAXATION, *ET AL.*, DEFENDANTS-RESPONDENTS.

ERIE RAILROAD COMPANY, A CORPORATION OF THE STATE OF NEW YORK, PLAINTIFF-APPELLANT, v. AARON K. NEELD, DIRECTOR, DIVISION OF TAXATION, *ET AL.*, DEFENDANTS-RESPONDENTS.

LEHIGH VALLEY RAILROAD COMPANY, A CORPORATION OF THE STATE OF PENNSYLVANIA, PLAINTIFF-APPELLANT, v. AARON K. NEELD, DIRECTOR, DIVISION OF TAXATION, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued January 7, 1958—Decided February 17, 1958.

*Messrs. Joseph C. Glavin, Augustus Nasmith* and *Raymond J. Lamb* argued the causes for the appellants (*Messrs. Emory, Langan, Lamb & Blake,* attorneys for plaintiffs-appellants Erie Railroad Company and Lehigh Valley Railroad Company).

*Messrs. Herbert H. Fine* and *Leo Rosenblum* argued the causes for the respondents (*Mr. Ezra L. Nolan,* Corporation Counsel of the City of Jersey City, attorney for defendant-respondent City of Jersey City and *Mr. James Rosen,* attorney for defendant-respondent Township of Weehawken and *Mr. Herbert H. Fine,* attorney for defendant-respondent City of Hoboken).

The opinion of the court was delivered by

JACOBS, J.    These are four consolidated appeals from judgments of the Law Division dismissing, without prejudice, the complaints filed by the plaintiff railroad companies. Appeals were taken to the Appellate Division and we certified on our own motion.

In March 1953 the Director, Division of Taxation in the Department of the Treasury, certified his assessments

against the plaintiff railroads' properties in the defendant municipalities. The railroads, contending that their properties had been assessed in excess of true value and that their Class II properties had been assessed above the common standards or levels of valuations used by the municipalities, appealed to the Division of Tax Appeals in accordance with *R. S.* 54:29A–31. The municipalities, contending that the Class II properties had been assessed below true value, also appealed to the Division of Tax Appeals in accordance with *R. S.* 54:29A–31. In 1954, 1955 and 1956 similar appeals from the Director's assessments were taken to the Division of Tax Appeals by the railroads and the municipalities. Although some of the appeals have been decided, most of them still await hearing and determination by the Division of Tax Appeals. Under the principles announced this day in *the Central Railroad Company of New Jersey v. Neeld,* 26 *N. J.* 172 (1958), the railroads must generally first exhaust their statutory appeals in the Division of Tax Appeals and may, thereafter, obtain judicial review in the Appellate Division pursuant to *R. R.* 4:88–8. However, in the instant matter the railroads urge that in view of the Division's delay in hearing their appeals, the Law Division would be justified in entertaining and adjudicating their complaints without awaiting any further action in the Division. The relief they seek is to have the Law Division take immediate jurisdiction over the railroad tax controversies relating to the assessments for 1953–56 inclusive and actually determine the true value of their properties and the common level or ratio of assessed to true value of the locally assessed properties. That the granting of such relief would indeed be extraordinary may readily be gathered from pertinent judicial opinions such as *Delaware, L. & W. R. Co. v. City of Hoboken,* 10 *N. J.* 418, 424 (1952), where the cause was remanded to the Division of Tax Appeals with the following comments:

"Our review of the record persuades us that the cases must be remanded to the Division of Tax Appeals for further proceedings. There is a fatal defect in the record. The parties have not had

the benefit of findings of fact by the Division of Tax Appeals as required by *R. S.* 54:2–16. The deficiency was not remedied in the Appellate Division by an independent determination by that court of the basic facts and the making of its own assessments based thereon. However, we have held that usually the better appellate practice in cases presenting complex questions of value such as this is not to exercise the power conferred by *Article* VI, *Section* V, *paragraph* 3 of the *Constitution of* 1947 and *Rule* 3:81–13 independently to review the facts and make the assessment. *City of Newark v. West Milford Tp., Passaic County,* 9 *N. J.* 295, 301 (1952). Appellate courts should not inject themselves into the field of original valuation in such cases except in very exceptional circumstances. *Cf. Kendrick Coal & Dock Co. v. Com'r. of Internal Revenue,* 29 *F. 2d* 559 (*C. C. A.* 8, 1928). The valuation of property in railroad use particularly presents 'highly technical' problems for experts. *Long Dock Co. v. State Board of Tax Assessors,* 86 *N. J. L.* 592 (*E. & A.* 1914), reversing *Long Dock Co. v. Hendrickson,* 85 *N. J. L.* 536 (*Sup. Ct.* 1914). The coordination and evaluation of such expert evidence is often a matter of considerable difficulty because of the unique problems entailed in the valuation of properties in railroad use and the increment in value, if any, resulting from the assemblage and consolidation of several tracts, *Pennsylvania Railroad Co. v. Jersey City,* 98 *N. J. L.* 283 (*E. & A.* 1922). The task of coordination and evaluation of such evidence has been expressly committed by the Legislature to the Division of Tax Appeals, a body contemplated to bring an informed judgment from specialized experience to the nice balancing and ultimate resolution of the many complex factors involved."

The complaints contained various allegations designed to establish that there have been extended delays in the disposition of railroad tax appeals in the Division. Thus they assert that since 1953 there have been 101 appeals relating to Class II railroad tax properties only seven of which were heard and finally disposed of by the Division; that no date has been set for hearing on any of the plaintiffs' appeals from the assessments for 1953–56, inclusive; and that "under the present calendar and methods of procedure in the Division, there is no prospect that any of said causes will be reached for hearing in the foreseeable future." But there were representations (not disputed by the railroads at the oral argument) that the Division has actually taken steps to bring the tax appeals of the railroads on for hearing and determination. Thus in an affidavit dated June 21, 1957 the secretary of the Division asserted that on May 20,

1957 the Division announced in the presence of the attorneys for the railroads, that "a pretrial of all the railroad tax appeals presently pending before the Division of Tax Appeals" would be held on June 28, 1957, and that "at least two panels of the Division of Tax Appeals would devote their time to railroad tax appeals, starting with September 4, 1957, and sitting, with the exception of certain dates, such as meetings of the Division, from day to day." And in an affidavit dated November 4, 1957 he stated that on June 28, 1957 a pretrial was held and that at that time it was announced that two panels of the Division would start hearing railroad tax appeals on September 4, 1957; that on September 4, 1957 two panels of the Division sat at Jersey City to call their respective lists of causes and to start hearings; that one panel after calling its list announced that hearings on the Pennsylvania Railroad appeals would be continued, and they are currently being held; that the other panel called its list on September 4, 1957 and requests were then made by the attorneys of record for adjournments in Case No. 1, *New York Central Railroad v. Director, Division of Taxation,* Case No. 2, *Town of West New York v. Director, Division of Taxation, and New York Central Railroad,* and Case No. 3, *Township of North Bergen v. Director, Division of Taxation, and New York Central Railroad;* and that since these appeals were not ready for hearing it was necessary to start hearings upon Case No. 4, *the Reading Company v. Director, Division of Taxation,* in which case, after some proof had been taken, an adjournment was granted at the request of the attorney for the Reading Company.

The plaintiff railroads do not suggest that they have ever made any formal applications to the Division for early determination of their appeals or that the Division has discriminated against them in arranging its calendars for the hearing of appeals. Indeed, they do not now request or seek any judicial relief in lieu of *mandamus* to compel the Division to hear them expeditiously and proceed to decision. See *Matter of Mandamus in the case of Prickett,* 20 *N. J. L.*

134, 135 (*Sup. Ct.* 1843); *Switz v. Middletown Twp.,* 23 *N. J.* 580, 587 (1957). *Cf. Schirmer v. Cockrill,* 223 *Ark.* 817, 269 *S. W. 2d* 300 (1954); *State ex rel. Ricco v. Biggs,* 198 *Ore.* 413, 255 *P. 2d* 1055, 38 *A. L. R. 2d* 720 (1953). On the contrary, their prayer is that the trial court now exercise the function of correcting excessive and discriminatory assessments—a function which *R. S.* 54:29A–33 vests in the Division of Tax Appeals rather than in the courts. There undoubtedly have been regrettable delays in the hearing of the railroad tax appeals but, as hereinbefore indicated, some alleviative measures have recently been taken and, now that attention has been focused on the problem, additional steps may be forthcoming. See *Assembly Bill No. A* 97 (1958). *Cf. Report, New Jersey State Bar Association, Committee on Taxation,* 80 *N. J. L. J.* 565 (1957); *Editorial, "Tax Appeals," Newark Evening News,* January 30, 1958, *p.* 12. In any event, it seems clear to us that the matter may not justly be dealt with by having the courts, upon the limited showing made, now displace the Division of Tax Appeals in the highly specialized function of evaluating and assessing railroad properties throughout the State.

Delay has always plagued the administration of justice in our country. As early as 1839 David Dudley Field referred to speedy justice in his state as "a thing unknown," and as late as 1956 Herbert Brownell, Jr. referred to delay in federal and state litigation as a "chronic shortcoming." See *Nims, "The Law's Delay: The Bar's Most Urgent Problem,"* 44 *A. B. A. J.* 27 (1958); *Proceedings of the Attorney General's Conference on Court Congestion and Delay in Litigation* (1956). Since the adoption of our Constitution of 1947 much has indeed been done in our State to meet the problem. The efficient operation of our court rules relating to administration and practice has reduced radically the time lag between the institution and termination of litigation; and although we now compare most favorably with other jurisdictions, the attainable goal is further reduction of the time lag consistent with the

interests of justice. But since administrative agencies are not generally subject to the rules governing our courts (*Mulhearn v. Federal Shipbuilding and Dry Dock Co.*, 2 *N. J.* 356 (1949)), it is the executive and legislative branches of government which must be charged with the important responsibility of taking effective steps towards the early removal of delays in all administrative proceedings. *Cf. In re Greenville Bus Co.*, 17 *N. J.* 131, 147 (1954):

"The original application by the Greenville Bus Company was submitted early in 1952 and the final decision was rendered in June 1954. The many administrative hearings were held weeks and even months apart and they were sometimes devoted to extensive and repetitious or undisputed oral testimony which might well have been reduced by advance stipulations entered into under board guidance. A major reason for the tremendous growth of the administrative process was the belief that the judicial process was unduly rigid, slow and expensive. Since the adoption of our Constitution of 1947 our courts have done much towards the elimination of the grounds underlying this belief. The procedures in the instant matter would no longer be tolerated in our courts and it seems ironic that far-reaching administrative agencies continue to follow them. See *Abbotts Dairies, Inc. v. Armstrong, supra*, 14 *N. J.*, at *page* 332.

Professor Davis points to the unfortunate fact that many administrative proceedings are now slower than comparable judicial proceedings. *Davis, Administrative Law* 294, 295 (1951). He refers to a study of ordinary complaint and answer cases in the Interstate Commerce Commission which shows that the shortest time from complaint to decision was 344 days, the longest 1847 days and the average 622 days; and he cites many long delayed decisions in the National Labor Relations Board with the following comment:

"Substantive rights are sometimes seriously impaired by delay, and the question has often come to reviewing courts, especially in N. L. R. B. cases, whether the result is denial of due process. When proceedings in one case 'unfortunately' had taken two and a half years, the Supreme Court refused to shorten the period of compensation for back pay, but declared: 'Handling of complaints as quickly as is consistent with good administration is of course essential. It is important both to the employer, who may have to

pay back wages, and to the employee, who must live without his job.' Even when the Board did not hear a case for four years and made no decision until a year after hearing, the court deemed itself powerless to intervene."

See also *American Mut. Liability Ins. Co. v. McDonough,* 61 *F. 2d* 558, 563 (7 *Cir.* 1932), *cert.* denied, 288 *U. S.* 602, 53 *S. Ct.* 386, 77 *L. Ed.* 977 (1933). Justice demands that administrative agencies always remain alert to the need for prompt decisions on their part and where their personnel and facilities appear insufficient to meet their workloads they should, through appropriate channels, seek corrective action. In proper cases judicial relief may be obtained to compel them to proceed to early hearing and decision but that is a far cry from the suggested course of having the courts take over their highly specialized work in the event they delay. That course would tend to discard the legislative policies which brought about the expert administrative agencies and might well strip our judicial system of the important gains it has made.

The railroads place reliance on *Smith v. Illinois Bell Teleph. Co.,* 270 *U. S.* 587, 46 *S. Ct.* 408, 70 *L. Ed.* 747 (1926), where the court, without awaiting final administrative action, enjoined the Illinois Commerce Commission from enforcing a schedule of rates alleged to be confiscatory. There the plaintiff telephone company's predecessor had filed a schedule of rates but before approval the plaintiff filed a second schedule. The Commission approved the first schedule and suspended the effective date of the second schedule. On appeal to the Circuit Court of Peoria County the Commission's action was reversed and the cause was remanded for further proceedings. Hearings were held in 1922 and an application for a temporary schedule pending final determination was denied. In 1923 the plaintiff called the Commission's attention to the delay in deciding the cause and to the fact that revenues fell short of meeting expenses and requested the Commission to set the cause for an early hearing. The request was ignored and in 1924 the plaintiff filed its injunction complaint in the Federal District Court

alleging that the Commission had failed and refused to determine the issues in the cause or to determine whether the rates in the second schedule were just and reasonable and, alleging further, that the rates in the first schedule not only did not yield a fair return but were insufficient to pay operating expenses. After a motion to dismiss the complaint was denied the Commission refused to plead further and an injunction was thereupon granted. In its affirmance the United States Supreme Court, through Justice Sutherland, had this to say:

"It thus appears that, following the decree of the state court reversing the permanent order in respect of the second schedule and directing further proceeding, the commission for a period of two years, remained practically dormant; and nothing in the circumstances suggests that it had any intention of going further with the matter. For this apparent neglect on the part of the commission, no reason or excuse has been given; and it is just to say that, without explanation, its conduct evinces an entire lack of that acute appreciation of justice which should characterize a tribunal charged with the delicate and important duty of regulating the rates of a public utility with fairness to its patrons but with a hand quick to preserve it from confiscation. Property may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them; and where, in that respect, such a state of facts is disclosed as we have here, the injured public service company is not required indefinitely to await a decision of the rate-making tribunal before applying to a Federal court for equitable relief."

Unlike the situation in the *Smith* case the plaintiff railroads never made any application to the Division to expedite their causes and the Division has taken steps towards bringing them on for hearing. Furthermore, the railroads do not here present any constitutional issue of confiscation resulting from continued operation without fair return. If it should ultimately be determined that they have paid excess taxes for the years in question, they will readily obtain credits on later taxes payable by them. See *R. S.* 54:29*A*–49. And while it may be true that they will have lost interest which they might have earned on such excess payments, that is a common incident in the complex ad-

ministration of our tax laws which would not justify the exceptional relief sought here by the railroads.

We agree fully with the action of Justice (then Judge) Francis in dismissing the complaints filed by the plaintiff railroad companies and the judgments entered in the Law Division are accordingly:

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS and PROCTOR—5.

*For reversal*—None.